**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO MERCANTILE EXCHANGE, INC.** | ) | |
| **and BOARD OF TRADE OF THE** | ) | |
| **CITY OF CHICAGO, INC.,** | ) | **No. 09 C 3895** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Judge Ruben Castillo** |
| **v.** | ) | |
| | ) | |
| **TECHNOLOGY RESEARCH GROUP, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Chicago Mercantile Exchange, Inc. ("CMEI") and Board of Trade of the City of Chicago

("CBOT") (collectively, "Plaintiffs")[1] filed this patent action against Technology Research

Group, LLC ("TRG"), seeking a declaratory judgment pursuant to the Declaratory Judgment Act,

28 U.S.C. § 2201 *et seq.* (R. 19, Am. Compl.) Specifically, Plaintiffs seek a declaration that

United States Patent No. 5,963,923 ("'923 patent") is "invalid, unenforceable, and not infringed"

by them. (*Id.* at 1.) Presently before the Court are the parties' proposed constructions of certain

claim terms. (R. 82, Pls.' Mem.; R. 85, Def.'s Mem.) The terms are construed as set forth

below.

---

[1] CMEI is a financial and commodity derivatives exchange, while CBOT operates an
exchange that deals in commodity futures and options on futures through open auction and/or
electronic means. (R. 19, Am. Compl. ¶¶ 1, 3.)

On June 3, 1997, Howard B. Garber ("Garber") filed patent application No. 08/868,200

("'200 application") entitled "System and Method for Trading Having a Principal Market

Maker."[3] (R. 82, Pls.' App., Ex. 7 at 1.) In its summary of the proposed invention, the

application provides:

> The present invention provides a method and system for linking Rolling Spot Currency
> contracts with a [Principal Market Maker ("PMM")] specialist program. The Rolling
> Spot Currency contracts are futures contracts which in almost all aspects replicate spot
> currencies in the [foreign exchange] market. The PMM specialist program is designed to
> replicate an over-the-counter bank trading environment by merging the best aspects of a
> specialist system–a combined trader and broker, charged with the responsibility of
> making a sized two-sided, bid/offer market–with a traditional futures pit trading
> environment.

(*Id.* at 26.)

In an Office Action dated February 10, 1998 ("First Office Action"), the United States

Patent and Trademark Office ("USPTO") rejected all fifty-one claims in Garber's application.

(*Id.* at 72.) There were several grounds for the USPTO's decision. For example, the USPTO

arrived at the following conclusions: (1) rejected claims 1-23 and 28-33 under 35 U.S.C. § 112

("Section 112") for containing indefinite language and failing to clearly recite the structural

---

[2] The relevant facts have been culled from the exhibits attached to Plaintiffs' claim
construction memorandum (R. 82, Pls.' App.) and TRG's claim construction memorandum (R.
85, Def.'s App.).

[3] Garber previously filed provisional application No. 60/030,584 ("'584 provisional
application") entitled "System and Method for Trading Currencies Through a Principal Market
Maker and Rolling Spot Link" on November 12, 1996. (R. 82, Pls.' App., Ex. 6 at 3.)

features being claimed;[4] (2) rejected claims 34-51 under 35 U.S.C. § 101 ("Section 101")

because they failed to recite statutory subject matter;[5] (3) claims 1-7, 13, 24, 25, 33 and 49-51

were rejected under 35 U.S.C. § 102(b) ("Section 102(b)") as being anticipated by U.S. Patent

No. 4,677,552 ("Sibley '552 patent");[6] (4) rejected claims 14-51 under Section 102(b) as being

anticipated by U.S. Patent No. 5,168,446 ("Wiseman '446 patent"); and (5) claims 8-12 were

rejected under 35 U.S.C. § 103(a) as being unpatentable over the Sibley '552 patent.[7] (*Id.* at 72-

81.)

    In response to the First Office Action, Garber made several amendments and traversed the

USPTO's rejections. (*Id.* at 101.) Garber's response provided the following: (1) noted the

amendments made to his application to remedy the indefiniteness rejection; (2) contended that

the Section 101 rejection was improper because the proposed invention automatically maintained

---

[4] In relevant part, Section 112 provides that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.

[5] Section 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

[6] Section 102(b) provides that a "person shall be entitled to a patent unless–the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

[7] Section 103(a) states that a "patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103(a).

a market and thus provided a practical application within the technological arts; (3) argued that the first Section 102(b) rejection was incorrect because his proposed invention overcame the Sibley '552 patent by, among other things, using a market maker computer in the trading of commodities; (4) maintained that the second Section 102(b) rejection was improper because "the use of a market maker or specialist, whether human or otherwise, is completely foreign to commodities trading"; and (5) contended that the Section 103(a) rejection was incorrect because the proposed invention overcame the Sibley '552 patent by using a market maker computer in the trading of commodities. (*Id.* at 103-07.)

The USPTO issued a Second Office Action on August 13, 1998 in which it withdrew the Section 102(b) and Section 103(a) rejections which had previously been based on the Sibley '552 and Wiseman '446 patents. (*Id.* at 113, 116, 121.) It allowed claims 14-21, but it either rejected or objected to the remaining claims. (*Id.* at 113.) In its Second Office Action, the USPTO rendered the following decisions: (1) objected to claims 13 and 27 for being vague and informal, respectively; (2) rejected claims 26-32 because they contained limitations with an insufficient antecedent basis; (3) rejected claims 1, 2, 13, 24, 33, 49, and 50 on Section 102(b) grounds because they were clearly anticipated by U.S. Patent No. 4,903,201 ("Wagner '201 patent"); (4) claims 8-12 were rejected on Section 103(a) grounds as being unpatentable over the Wagner '201 patent because "it would have been obvious to one of ordinary skill in the art at the time of applicant's invention to link the trading system of Wagner to one or more trading networks in order that the trading time period and coverage is expanded"; and (5) objected to claims 3-7 as being dependent upon a rejected base claim. (*Id.* at 116-20.)

On November 17, 1998, Garber responded to the Second Office Action. (*Id.* at 137.) In

4

his response, Garber made several amendments to his application and traversed the Examiner's objections and rejections. (*Id.* at 127-34.) Garber's response provided the following: (1) noted that the amendments made to the application cured the vagueness, informality, and antecedent basis defects; (2) argued that his invention overcomes the Wagner '201 patent because the latter "will not automatically and continuously maintain a bid and offer market for a given commodity"; (3) similarly contended that the Section 103(a) rejection was improper because the Wagner '201 patent does not disclose a principal market maker computer that automatically maintains a constant bid and offer market for any traded commodity. (*Id.* at 134-37.)

In December 2008, the USPTO issued a Third Office Action. (*Id.* at 150.) In this Office Action, the USPTO rejected claim 27 on indefiniteness grounds. (*Id.* at 143.) It also rejected claims 1-13, 24-25, 33-36, and 49-55 for "being unpatentable over Hakansson and in further view of Wagner '201." (*Id.* at 143.) The USPTO did, however, allow claims 14-21, 23, and 37-48. (*Id.* at 141.)

On March 10, 1999, Garber responded to the Third Office Action. (*Id.* at 156.) In his response, he cancelled claims 1-13, 24-25, 33-36, and 49-55. (*Id.* at 155.) He also amended the remaining claims to place them in an allowable condition. (*Id.*) In the spring of 1999, the USPTO issued a Notice of Allowability in which it allowed claims 14-21, 23, 26-32, and 37-48. (*See id.* at 159-63.) The '923 patent–containing 6 independent and 22 dependent claims–was issued on October 5, 1999. (R. 82, Pls.' App., Ex. 2.)

5

## PROCEDURAL HISTORY

On May 6, 2004, Garber initiated an action ("Prior Action") against CME, CBOT, Chicago Board Options Exchange, and One Chicago, LLC ("Prior Defendants").[8] In his complaint, he alleges that the Prior Defendants' use of a computerized market maker in futures and commodities trading infringed the '923 Patent. The Prior Action was dismissed with prejudice, and the Federal Circuit subsequently reversed the dismissal, *Garber v. Chicago Mercantile Exch.*, 570 F.3d 1361 (Fed. Cir. 2009), which allowed the dispute over the '923 patent to proceed.

Plaintiffs initiated this action on June 26, 2009, and subsequently amended their complaint on August 4, 2009. (R. 1, Compl.; R. 19, Am. Compl.) In Counts I and II of their complaint, Plaintiffs seek a declaratory judgment establishing that they "[have] not and [do] not infringe, directly or indirectly, any valid and enforceable claim of the '923 patent." (R. 19, Am. Compl. ¶¶ 28, 33.) In Count III, they seek a declaratory judgment stating that the '923 patent is "invalid for failure to comply with one or more of the conditions and requirements for patentability." (*Id.* ¶¶ 36-38.) Finally, in Count IV, Plaintiffs allege that various defenses render the '923 patent unenforceable. (*Id.* ¶¶ 39-40.)

On August 28, 2009, TRG[9] answered the amended complaint and filed a counterclaim against CMEI, CBOT, and the CME Group, Inc. ("CME Group") (collectively,

---

[8] The Court takes judicial notice of the complaint in *Garber v. Chicago Mercantile Exch.*, No. 04 C 3238, as it is part of the public record. *See Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 676 n.2 (7th Cir. 2009).

[9] Garber was originally named as a defendant in this action. (R. 19, Am. Compl.) On August 21, 2009, he was dismissed and TRG was substituted as a party-defendant. (R. 30, Min. Entry.) All right, title and interest in the '923 patent was transferred to TRG in July 2009. (*See* R. 27, Stipulation and Joint Mot. for Substitution of Party.)

"Counterdefendants"); the counterclaim was subsequently amended. (R. 41, Countercl.; R. 47, Am. Countercl.) In its counterclaim, TRG alleges that Counterdefendants' "use of an electronic market maker system in futures and commodities trading is an infringement of the '923 patent in violation of 35 U.S.C. § 271(a), (b), and/or (c)." (R. 47, Am. Countercl. ¶ 9.)

Presently before the Court are the parties' briefs supporting their proposed constructions of several claim terms.[10]

## LEGAL STANDARD

An infringement action proceeds in two steps. *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1281 (Fed. Cir. 2010). First, a court must engage in a claim construction analysis to determine the meaning and scope of the patent claims asserted to be infringed. (*Id.*) The second step centers on a comparison of the properly construed claims to the device accused of infringing. (*Id.*) At this stage of the present infringement action, the Court will focus on claim construction.

"The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) (quoting *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)). In proceeding with a claim construction analysis, the Federal Circuit has made clear that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.

---

[10] The Federal Circuit has stated that "[c]laim construction is a matter of resolution of disputed meanings and technical scope." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Despite the clear purpose of a claim construction analysis (and the years of litigation related to the '923 patent), the parties place before the Court a number of terms whose meaning is undisputed.

2005). Thus, courts must begin their claim construction analysis with the words of the claim. *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005). The words of the claim are generally given their "ordinary and customary meaning," which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id.* In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)). Where the meaning of a claim term as understood by persons of skill in the art is not immediately apparent, the court must look to those "sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.*

The claims do not stand alone. *Id.* at 1315. Rather, they are part of a "fully integrated written instrument consisting principally of a specification that concludes with the claims." *Id.* Thus, "claims must be read in view of the specification, of which they are a part." *Id.* (internal citation and quotation marks omitted). The specification is always highly relevant to the claim construction analysis and is usually dispositive. *Id.* Indeed, it is the "single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). While claims must be read in view of the specification, the Federal Circuit has cautioned that "limitations from the specification are not to be read into the claims." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002).

In addition to the claim language and specification, the prosecution history should also be considered in the claim construction analysis. *Phillips*, 415 F.3d at 1317. The prosecution

history–which like the claim language and specification is considered intrinsic evidence–consists of the complete record of the proceedings before the USPTO and includes the prior art cited during the examination of the patent. *Id.* Like the specification, the prosecution history provides evidence of how the USPTO and the inventor understood the patent. *Id.* The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Although the Federal Circuit has emphasized the importance of intrinsic evidence in claim construction, it has also authorized district courts to rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* While extrinsic evidence "can shed useful light on the relevant art," the Federal Circuit has explained that it is "less significant than the intrinsic record in determining the 'legally operative meaning of claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). Further, it has noted that while a court may consider extrinsic evidence, it has cautioned that "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." *Phillips*, 415 F.3d at 1319. With this background in mind, the Court proceeds to construing the terms presented by the parties.

**ANALYSIS**

**I.** **"[P]rincipal market maker"**

The parties first ask the Court to construe the claim term "principal market maker." (R. 82, Pls.' Mem. at 11-14; R. 85, Def.'s Mem. at 10-17.) Plaintiffs propose construing "principal market maker" as "an entity that is assigned to: (i) continuously maintain a two-sided bid/offer market of specified size and spread for its designated products, (ii) maintain a public order book with respect to these assigned products, and (iii) give priority to customer order execution over personal trading." (*Id.*, Ex. 1 at 1.) In contrast, TRG defines the claim term as "an organization designated by an exchange to maintain a two-sided bid/offer market in return for priority volume benefits." (R. 85, Def.'s Mem. at 11.) For the following reasons, the Court rejects both proposed constructions.

Because the meaning of "principal market maker" as understood by a person of skill in the art is not readily apparent, its construction involves more than the "application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Thus, the Court must look to those "sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* The Court therefore turns to an examination of the intrinsic record.

Plaintiffs first argue that Garber acted as his own lexicographer and explicitly defined the claim term "principal market maker" in the specification. (R. 82, Pls.' Mem. at 11-12.) Plaintiffs point to the following language contained in the specification in support of this argument:

The [Principal Market Makers] functions are similar to that of a market making foreign

exchange bank and broker specialist. A PMM specialist should continuously maintain a sized two-sided bid/offer market for its designated products. This market should be of a designated minimum quantity and maximum spread, i.e., the difference between bid and offer. Also, the PMM should maintain the "public order book" (collection of public customer orders to purchase or sell) with respect to the assigned products. Finally, the PMM should give priority to customer order execution over personal trading.

'923 patent, col. 1, ll. 35-45.

When a patentee acts as his own lexicographer and gives a claim term a special definition that differs from the meaning it would otherwise possess, it is the patentee's definition that governs. *Phillips*, 415 F.3d at 1316. If a "patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description." *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). Such a redefinition "must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Id.*

The Court finds Plaintiffs' first argument unpersuasive as the quoted specification language does not reveal an express intent to define "principal market maker." Rather, this language, taken in its context, merely provides background information regarding CME's proposed rules for its Principal Market Maker. *See* '923 patent, col. 1, ll. 23-45. Thus, it falls well short of the "reasonable clarity, deliberateness, and precision," *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998), needed to redefine a claim term.

Next, Plaintiffs contend that parts of the prosecution history support their proposed construction. (R. 82, Pls.' Mem. at 12-13.) Specifically, they point to the '584 provisional

application.[11]  (*Id.*)  In the '584 provisional application, Garber provides an overview of his proposed invention, which he describes as "the opportunity of linking the Chicago Mercantile Exchange's Rolling Spot Currency contracts with the Principal Market Maker program (PMM)."[12]  (R. 82, Pls.' App., Ex. 6 at 5.)  After describing the synergies generated by a combined PMM/Rolling Spot Currency program, Garber goes on to define a PMM's functions:

> The PMM's functions are similar to that of a market making foreign exchange bank and broker specialist.  In return for specified considerations, a PMM specialist will be required to provide the following functions: (1) A PMM must continuously maintain a two-sided bid/offer market for their designated products.  This market must be of a designated minimum quantity and maximum spread–the difference between bid and offer; (2) the PMM must maintain the "public order book" with respect to the assigned products; and (3) the PMM must give priority to customer order execution over personal trading.

> As compensation for the above named functions, the PMM is entitled to the following considerations; (1) guaranteed participatory volume . . . (2) The retention of floor executed brokerage transactions commissions, except where principal-agency conflicts of interest apply.

(*Id.* at 7.)

The Court finds that this portion of the intrinsic record provides support for Plaintiffs' position that, contrary to TRG's proposed construction, a "principal market maker" must do more than merely "maintain a two-sided bid/offer market in return for priority volume benefits."

---

[11]  The prosecution history consists of the complete record of the proceedings before the USPTO.  *Phillips*, 415 F.3d at 1317.  The '584 provisional application is part of the complete record of the proceedings before the USPTO leading to the issuance of the '923 patent, and is thus properly considered part of its prosecution history.  *See, e.g., Juniper Networks, Inc. v. Bahattab*, No. 07-1771, 2009 WL 1285916, at *6 (D.D.C. May 8, 2009) (considering a provisional application as part of the prosecution history).

[12]  This description is virtually identical to the general description provided in the Summary section of the '923 patent.  *See* '923 patent, col. 3, ll.41-50 ("The present invention provides a method and system for linking Rolling Spot Currency contracts with a PMM specialist program.").

In support of its proposed construction, TRG argues that several pieces of extrinsic evidence indicate that those skilled in the art understood the term "principal market maker" to "mean an organization designated by an exchange to maintain a two-sided bid/offer market in return for priority volume benefits." (R. 85, Def.'s Mem. at 11.) The Court finds TRG's argument unpersuasive as it decontextualizes the portions of the extrinsic record upon which it relies. For example, it points to a CME Memorandum which states: "A PMM will be required to make two-sided markets in both products for a minimum number of contracts and at a maximum bid/ask spread. . . . In return, a PMM is guaranteed a percentage of trading activity based on average daily volume." (R. 85, Def.'s App., Ex. 4 at 1.) While this excerpt does provide support for TRG's position, it fails to note that CME also stated that the official rules for the PMM Program were attached to the document. (*Id.* ("The official rules for the PMM Program follow this memorandum.")) In these rules, it is clearly stated that a PMM must not only continuously maintain a two-sided market, but must also maintain an order book and give priority to customer order execution. (*See id.* at 2-3.) In exchange for the fulfillment of these responsibilities, the rules also state that the PMM is entitled to certain priority volume benefits. (*Id.* at 3.)

Similarly, TRG's reliance on CME's application to receive a prohibited transaction exemption under ERISA Section 408(a) is unconvincing. Again, TRG points to language stating that the overall incentive for a PMM to satisfy its responsibilities is its priority volume benefits. (R. 85, Def.'s App., Ex. 3 at 9.) What it conveniently fails to draw to the Court's attention is the preceding language describing a PMM's responsibilities, such as making a two-sided market,

13

maintaining an order book, and prioritizing customer orders.[13] (*Id.* at 8.)

The Court finds that a person of ordinary skill in the art at the effective filing date of the '923 patent application would have understood the term "principal market maker" to mean more than "an organization designated by an exchange to maintain a two-sided bid/offer market in return for priority volume benefits." Based on evidence presented by the parties, the Court construes the claim term "principal market maker" as "an entity required to provide the following functions: (1) continuously maintain a two-sided bid/offer market of specified size and spread for its designated product(s); (2) maintain a public order book with respect to these assigned products; and (3) give priority to customer order execution over personal trading. As compensation for the fulfillment of these responsibilities, this entity is to receive priority volume benefits."

## II. "[C]omputer"

Plaintiffs fail to provide a distinct definition of the claim term "computer." (R. 82, Pls.' Mem. at 15-16.) Instead, they ask the Court to construe the term "principal market maker . . . computer," and propose the following definition: "a computer that independently performs each and every function of the principal market maker (as construed) separate from and without being incorporated into any other clearing or trading system, computer or engine (including the GLOBEX and Project A systems)." (R. 82, Pls.' App., Ex. 1.) The Court finds that this definition is not only circular with respect to its construction of the term "computer," but also

_____

[13] TRG also relies upon a footnote in a Commodity Futures Trading Commission ("CFTC") advisory opinion and a 1995 news article to support its proposed construction. (*See* R. 85, Def.'s App., Ex. 8 at 6 n.9; Ex. 10.) These pieces of extrinsic evidence are unpersuasive as they merely indicate the use of priority volume benefits as incentives for a PMM, and do not define its responsibilities in maintaining the market.

14

seeks to import limitations that are not located in the claim language.

In support of their position, Plaintiffs first draw the Court's attention to the '923 patent's specification and argue that language contained in the specification require the "principal market maker . . . computer" to perform its functions "separate from and without being incorporated into any other clearing or trading system, computer or engine." (R. 82, Pls.' Mem. at 15.) Plaintiffs' argument fails as it improperly seeks to import a limitation from the written description. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) ("The court must take care in its analysis, when locating in the written description the context for a disputed term, not to import a limitation from that written description. It must use the written description for enlightenment and not to read a limitation from the specification."). Their argument based on the patent figures and their accompanying text is similarly unavailing as it impermissibly attempts to use a preferred embodiment to limit the claims without an express declaration by the patentee. *See id.* at 907-08 ("Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee"). Plaintiffs do not to point to such an express declaration by Garber, and fail to do so for good reason: Garber clearly stated that the descriptions provided in the specification were "illustrative rather than limiting." '923 patent col. 10, l. 45.

Claim terms are generally given their "ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1312-13. In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves

little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (citing *Brown v. 3M*, 265 F.3d at 1352). Where the ordinary meaning is readily apparent, the Federal Circuit has noted that general purpose dictionaries may be helpful in construing a claim term. *Id.*; *see Vitronics*, 90 F.3d at 1584 n.6 (Judges may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

Here, the Court finds that the claim term "computer" has a readily apparent meaning. As such, the Court will rely upon general purpose dictionaries and will construe "computer" as follows: "a programmable electronic device that can store, retrieve, and process data."[14]

## III.    Independent claim preambles

Next, Plaintiffs argue that the preambles to the '923 patent's independent claims should be construed as required claim limitations. (R. 82, Pls.' Mem. at 16.) They specifically argue that because the claim preambles are "necessary to give life, meaning, and vitality" to the claims, they must be construed as limitations. (*Id.*) The Court partially agrees with Plaintiffs' position.

In general, a preamble is construed as a limitation "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal citation and quotation marks omitted). A preamble is not limiting, however, "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the

---

[14] The Court relies upon the most relevant definitions found in the following two general purpose dictionaries: (1) Webster's Third New International Dictionary 468 (1981) (defining "computer" as "a programmable electronic device that can store, retrieve, and process data"); and (2) Merriam-Webster's Collegiate Dictionary 256 (11th ed. 2003) (defining "computer" as "a programmable usu. electronic device that can store, retrieve, and process data").

invention" or to provide "context for what is being described in the body of the claim." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008). Indeed, "a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Catalina*, 289 F.3d at 809.

"In considering whether a preamble limits a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006); *accord Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1366 (Fed. Cir. 2010). "A term is often limiting when the patentee has relied on it during prosecution to distinguish prior art, as such reliance demonstrates that the feature disclosed in the preamble is necessary to the patentability of the claim." *Hearing Components*, 600 F.3d at 1366 (citation omitted). "Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble generally is not limiting." *Symantec*, 522 F.3d at 1288 (internal citation and quotation marks omitted).

Plaintiffs argue that the preambles of independent claims 1, 9, 17, 21 and 25 should be properly considered limitations because the claims, specifications, drawings, title, and prosecution history all indicate that a "'principal market making computer' is a necessary element of Garber's alleged invention." (*See* R. 82, Pls.' Mem. at 17.) The Court finds this argument unpersuasive as it relates to independent claims 1 and 9, but concludes that portions of the preambles to claims 17, 21, and 25 must be considered claim limitations.

17

A preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention" or to "provide context for what is being described in the body of the claim." *Symantec.*, 522 F.3d at 1288. In this case, the Court finds that the preambles to claims 1 and 9 are not limiting because the claim body provides for a structurally complete invention. Indeed, as Plaintiffs note, a "principal market making computer" is a necessary and unique element of the invention, and is included in the body of claims 1 and 9. *See* '923 patent, col. 10, ll. 51-63. Because the preambles to claims 1 and 9 merely serve a contextual role, the Court finds that they are not claim limitations.[15]

On the other hand, the preambles to claims 17, 21, and 25 contain required claim limitations. In these three claims, the term "principal market maker computer" appears only in the preamble. *See* '923 patent, col. 11, ll. 51-67, col. 12, ll. 1-3; col. 12, ll. 10-28; col. 12, ll. 38-56. The term "principal market maker computer" as used in the preambles of these three claims must be considered a claim limitation because it states a "necessary and defining aspect of the invention." *On Demand*, 442 F.3d at 1343. Indeed, as evident in the prosecution history, the presence of a "principal market maker computer" is an essential component of what distinguished the '923 patent from the prior art. For example, in the Office Action issued in conjunction with the Notice of Allowability, the Examiner allowed claims 37-40 because "prior art fail[ed] to teach a computerized method having a principal market maker computer for maintaining a market for publicly traded currency futures." (R. 82, Pls.' App., Ex. 7 at 162.) The Court therefore finds that the term "principal market maker computer" as used in the

---

[15] The Court also finds that the preamble to claim 10 is also not limiting because the claim body provides for a structurally complete invention.

preambles of claims 17, 21, and 25 is necessary to the patentability of the claim, and is thus properly considered a claim limitation.[16]

## IV. "[E]xecute . . . trade(s) and orders"; "execute trades"; and "executing . . . trades and orders"

### A. "[E]xecute"

TRG, relying upon a technical definition of the word "execution," asks the Court to construe the term "execute" as meaning to "carry out a trade." (R. 85, Def.'s Mem. at 18.) Plaintiffs, on the other hand, fail to provide a specific definition of the term. Instead, they ask the Court to construe the phrases "execute trades and orders," "execute trades," and "executing trades and orders" to "mean completing a transaction of buying or selling a stock, a bond, or a commodity future contract through the process of offer and acceptance; executed trades are then cleared." (R. 82, Pls.' Mem., Ex. 1 at 4.) The Court rejects both of these proposed constructions.

To start, the Court notes that Plaintiffs' proposal fails to provide a specific definition of the term "execute." (*See* R. 82, Pls.' Mem. at 19.) The Court will not attempt to extricate a construction of this specific claim term from its proposed construction of the phrases "execute trades and orders," "execute trades," and "executing trades and orders."[17] Further, the Court

---

[16] Plaintiffs also contend that the term "rolling spot system" in the preamble of independent claim 1 is properly read as a claim limitation. (R. 82, Pls.' Mem. at 18.) The Court finds their argument unpersuasive as they fail to show a "clear reliance on the preamble in the prosecution history," *Symantec*, 522 F.3d at 1288, as it relates to this specific claim term. In addition, the claim term "rolling spot system" as used in the preamble of independent claim 1 is not "necessary to provide an antecedent basis for the body of the claim." *Id.* This conclusion is further supported by the fact that the deletion of the preamble language in question does not affect the structure or steps of the claimed invention. *See Catalina*, 289 F.3d at 809 ("[A] preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.").

[17] Plaintiffs also ask the Court to add the following limitation to these phrases: "The PMM computers, not the electronic trading systems such as the GLOBEX or Project A systems,

rejects TRG's proposed construction as it improperly narrows the definition of the term

"execute" to trades. (*See* R. 85, Def.'s Mem. at 18 ("Execute means to 'carry out a trade.'").) As

evident in the claims, the verb "execute" applies to both trades and orders. *See, e.g.*, '923 patent,

col. 11, ll. 14-17 ("a principal market maker futures computer operative to receive and

automatically execute . . . trades and orders").

The parties both rely on dictionary definitions in their proposed constructions. In the

absence of any intrinsic evidence suggesting a different meaning, the Court will also look to

dictionary definitions to construe the term "execute." Relying upon its definition in general

purpose dictionaries, along with the definition of the term "execution" in a technical dictionary,

the Court will construe the term "execute" as follows: "to carry out fully and completely."[18]

## B. "[T]rades" and "orders"

TRG does not propose specific constructions of the terms "trades" and "orders." Based

on statements in its brief, the Court understands TRG's position as being that, with the exception

of the term "principal market maker," the rest of the claim terms can be construed using both

general and technical dictionaries. (*See* R. 85, Def.'s Mem. at 10 ("These dictionaries can be

used to define all claim terms, with one exception.").) Plaintiffs, on the other hand, do provide

_____

execute trades and orders." (R. 82, Pls.' Mem., Ex. 1 at 4.) In support of their request, Plaintiffs
point to the specification and portions of the '923 patent's prosecution history. (*See* R. 82, Pls.'
Mem. at 19.) The Court finds it unnecessary to import these limitations to properly construe the
term "execute."

[18] The Court specifically relies upon the most relevant definitions found in the following
dictionaries: (1) Webster's Third New International Dictionary 794 (1981) (defining "execute" as
"to put into effect: carry out fully and completely"); (2) Merriam-Webster's Collegiate
Dictionary 436 (11th ed. 2003) (defining "execute" as "to carry out fully: put completely into
effect"); and (3) Barron's Dictionary of Finance and Investment Terms 172 (4th ed. 1995)
(defining "execution" as "carrying out a trade. A broker who buys or sells shares is said to have
executed an order.").

specific definitions of these terms. (*See* R. 82, Pls.' Mem. at 18.) Like TRG, Plaintiffs believe these terms can be construed using a dictionary. (*Id.*) Relying upon the definitions provided in the Fourth Edition of Barron's Dictionary of Finance and Investment Terms, the Court construes these terms as follows: (1) "trade" means "to carry out a transaction of buying or selling a stock, a bond, or a commodity future contract"; and (2) "order" means "instruction to a broker or dealer to buy or sell securities or commodities."

## V. "[R]eceive . . . purchase and sale trades and orders"; "receive the commodity bids and offers"

### A. "[R]eceive"

Next, Plaintiffs ask the Court to insert the word "directly" before the claim term "receive." (*See* R. 82, Pls.' Mem. at 20.) In support of their proposal, Plaintiffs point to the language in claim 1, which recites "a principal market maker operative to receive and automatically execute primary currency futures purchase and sale trades and orders." '923 patent, col. 10, ll. 49-53. According to them, "[b]y the plain language of [this] claim, PMM computers, not the electronic trading systems such as the GLOBEX or Project A systems, directly receive the purchase and sales trades and orders." (R. 82, Pls.' Mem. at 20.) Thus, they contend, the inclusion of the modifier "directly" before the claim term "receive" is proper. (*Id.*) The Court disagrees.

Plaintiffs point to various portions of the intrinsic record– specifically, the specification along with figures and their accompanying text–that suggest a direct relationship between the PMM computer and orders to support their request that the Court insert the modifier "directly" before the claim term "receive." (*See id.*) The Court finds Plaintiffs' arguments unconvincing as they improperly seek to import a claim limitation from the specification and patent figures. The

21

Federal Circuit has clearly warned against such a practice. *See, e.g., Playtex*, 400 F.3d at 907 (finding that a district court's reliance on figures to limit claim to a preferred embodiment was improper); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("Because the claims are best understood in light of the specification of which they are a part, however, courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee."). The Court therefore refuses to modify the term "receive."

### B. "[B]id" and "offer"

The parties agree that the claim terms "bid" and "offer" can be construed using dictionaries. (*See* R. 82, Pls.' Mem. at 20-21; R. 85, Def.'s Mem. at 10) Accordingly, the Court will again rely on Barron's Dictionary of Finance and Investment Terms and construes the terms as follows: (1) "bid" means "any offer to buy at a specified price"; and (2) "offer" means "any offer to sell at a specified price."

### VI. "[M]aintain a . . . market"

Plaintiffs ask the Court to construe the term "maintain a . . . market" to mean "to continuously provide a two-sided bid and offer market for a designated product." (R. 82, Pls.' Mem. at 21.) In contrast, TRG appears to propose that the Court interpret the claim term as meaning "to make a market." (*See* R. 85, Def.'s Mem. at 18 ("'Maintain a currency futures bid and offer market' means to make a market for currency futures.").)

The Court rejects TRG's proposed construction as it fails to shed light upon what it means to "maintain a . . . market." Merely exchanging the verbs "maintain" and "make" does not

help explain what it means to "maintain a . . . market."[19]

Plaintiffs point to several pieces of intrinsic evidence in support of their proposed construction. For example, they note that during prosecution Garber distinguished his proposed invention by arguing that the prior art did not disclose a computer that "automatically maintains a constant bid and offer market for any traded commodity." (R. 82, Pls.' App., Ex. 7 at 135.) Indeed, later in the same paragraph, Garber stated the following to overcome a piece of prior art: "Unlike the claimed invention, Wagner '201 will not automatically and continuously maintain a bid and offer market for a given commodity." (*Id.*) In their claim construction brief, TRG also provides support for Plaintiffs' proposed construction by quoting approvingly from a CME agreement which states that to "make markets" a party must "provid[e] continuous two-sided markets for certain products." (R. 85, Def.'s Mem. at 19.) Given this support, the Court finds that a person of ordinary skill in the art would conclude that Plaintiffs' proposed definition reflects the ordinary meaning of the claim term "maintain a . . . market." Accordingly, the Court construes the term "maintain a . . . market" as follows: "to continuously provide a two-sided bid and offer market for a designated product."

## VII.   "[A]utomatically"

The parties agree on the construction of the claim term "automatically." (R. 85, Def.'s Mem., Ex. 2 at 6.) The Court therefore construes "automatically" as meaning "marked by an action that arises as a consequence." (R. 82, Pls.' Mem. at 22.)

---

[19] Further, the terms are not interchangeable as a financial dictionary draws a distinction between the two. *See* Barron's Dictionary of Finance and Investment Terms 316 (4th ed. 1995) (in defining "make a market," stating that a dealer who "makes a market over a long period is said to *maintain* a market.").

**VIII. "[R]olling spot system"; "rolling spot future trade system"**

Plaintiffs also ask the Court to construe the term "rolling spot." (R. 82, Pls.' Mem. at 22-23.) According to Plaintiffs, "rolling spot" was known in the financial art as a proprietary contract: the CME's Rolling Spot contracts. (R. 82, Pls.' Mem. at 22.) Thus, they contend that the '923 patent's use of the term "rolling spot" should be understood as referring to CME's trademarked Rolling Spot Currency contracts and construed accordingly.[20] (*Id.* at 23.) To construe the term "rolling spot," the Court must engage in a two-step inquiry to determine: (1) whether "rolling spot" as used in the claims refers to CME's Rolling Spot contracts; and (2) if "rolling spot" refers to CME's Rolling Spot contracts, how the term should be construed in light of that relationship. The Court addresses each question in turn.

Support for Plaintiffs' position with regard to the first question can be found in the intrinsic record. In the '584 provisional application, Garber provides an overview of his proposed invention and notes that "the purpose of [the] document is to present the opportunity of linking the Chicago Mercantile Exchange's Rolling Spot Currency contracts with the Principal Market Maker program (PMM)." (R. 82, Pls.' Mem., Ex. 6 at 5.) This connection between Garber's invention and the CME's Rolling Spot contracts is reinforced by various references to Rolling Spot contracts in the '923 patent itself. *See, e.g.,* '923 patent, col. 3, ll. 40-50 ("The present invention provides a method and system for linking Rolling Spot Currency contracts with a PMM specialist program."); *Id.*, col. 10, ll. 19-20 ("A unique feature of the PMM/Rolling Spot Currency system"). Thus, given the connection between CME's Rolling Spot Currency contracts

---

[20] In the '584 provisional application, Garber notes that "Rolling Spot Currencies are contracts of the Chicago Mercantile Exchange" and that the CME "retain[ed] exclusive rights" to the use of the Rolling Spot name. (R. 82, Pls.' Mem., Ex. 6 at 13.)

and the term "rolling spot" evident throughout the intrinsic record of the '923 patent, the Court

finds that a person of ordinary skill in the art would conclude that when the patent uses the term

"rolling spot," it is referring to CME's Rolling Spot contracts.[21]

In light of this relationship, the Court finds that a construction of the term "rolling spot"

must be based on how a person of ordinary skill in the art at the time of the invention would have

understood CME's Rolling Spot Currency contracts. As part of their arguments related to the

proper construction of the term "rolling spot," Plaintiffs, relying upon Manual of Patent

Examining Procedure ("MPEP") 2173.05, first contend that any claim containing the term

"rolling spot" is indefinite because it uses a trademark as a claim limitation. (R. 82, Pls.' Mem.

at 23.) Paying heed to the Federal Circuit's instruction that claims should be construed to sustain

their validity, *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999), the Court finds it

unnecessary to find that the claims containing the term "rolling spot" are invalid on

indefiniteness grounds. Instead, the Court will construe the term "rolling spot" as a person of

ordinary skill in the art at the time of the invention would have understood the term. Based on

the conclusion that the term "rolling spot" refers to CME's Rolling Spot Currency contracts, the

term will be construed in accordance with how CME's Rolling Spot Currency contracts were

defined at the effective filing date of the patent application.[22]

---

[21] Despite being presented with these arguments regarding the relationship between the claim term "rolling spot" and CME's Rolling Spot Currency contracts, TRG failed to provide a proposed construction of the term. (*See* R. 85, Def.'s Mem.)

[22] Such a definition can be found in chapter 35 of the CME Rulebook in effect at the effective filing date of the patent application.

## IX.    "[C]ommodities"

The parties agree on the construction of the claim term "commodities." (R. 85, Def.'s Mem. at 20.) The Court therefore construes "commodities" as meaning "all commodities defined in the Commodities Exchange Act § 1a (1994) and futures contracts on those commodities." (R. 82, Pls.' Mem., Ex. 1 at 7.)

## X.    "[C]urrency futures"

Plaintiffs present the term "currency futures" for construction and ask that it be construed using a financial dictionary. (R. 82, Pls. Mem. at 24.) In the absence of any evidence indicating that a person of ordinary skill in the art would understand the term differently, the Court will construe the claim term "currency futures" as "contracts in the futures markets that are for delivery in a major currency such as U.S. dollars, British pounds, French francs, German marks, Swiss francs, or Japanese yen." Barron's Dictionary of Finance and Investment Terms 121 (4th ed. 1995).

## XI.    "[B]i-directional communications link coupled between the futures and options computers"; "a bi-directional communications link coupled between the options computer and principal market maker computer"; and "communications link"

Plaintiffs argue that the claim terms "bi-directional communications link coupled between the futures and options computers," "a bi-directional communications link coupled between the options computer and principal market maker computer," and "communications link" should be construed to mean "an electronic link that provides two-way, direct communication between computers." (R. 82, Pls.' Mem., Ex. 1 at 7.) Of specific importance, Plaintiffs contend that the term "coupled" should be interpreted to mean "a direct connection." (R. 82, Pls.' Mem. at 24-25.)

Plaintiffs maintain that the specification, along with the figures and their written descriptions, require a "construction in which the communication link directly connects the computers without routing the communications through any intervening components." (R. 82, Pls.' Mem. at 24.) Again, as with their prior attempt to insert a modifier into the construction of a claim term, this effort is unfruitful as it seeks to impermissibly import the claim limitation "direct" from the specification and patent figures. Specifically, Plaintiffs' argument fails as the figures and their accompanying text–which disclose preferred embodiments–cannot limit claim terms. *See Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations.") Further, as previously noted, the Federal Circuit has consistently warned against importing claim limitations from the specification. *E.g. Teleflex*, 299 F.3d at 1326 ("[T]he claims must be read in view of the specification, but limitations from the specification are not to be read into the claims."). The Court therefore rejects Plaintiffs' proposed constructions.

TRG, on the other hand, only asks the Court to construe the terms "link" and "coupled." (R. 85, Def.'s Mem. at 19.) They contend that these terms can be construed using a general purpose dictionary. (*Id.*) Because the ordinary meaning of these terms is readily apparent, the Court agrees that reliance on a general purpose dictionary is appropriate. *See Phillips*, 415 F.3d at 1314 (Where the "ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges," claim construction involves little more than the application of the widely accepted meaning of commonly understood words). Accordingly, these terms are construed as follows: (1) "link" means "a unit in a communication system"; and (2)

"coupled" means "to join for combined effect." *See* Merriam-Webster's Collegiate Dictionary 286, 724 (11th ed. 2003) (defining "coupled" as "to join for combined effect" and "link" as "a unit in a communication system").

**XII.   "[A] communications interface operative to transmit commodity bids and offers from at least one financial institution"; "a principal market maker computer coupled to the communications interface"**

Plaintiffs provide the following proposed construction for the claim term "communications interface": "an apparatus directly connecting one or more financial institutions to the principal market maker computer for communication between the financial institutions and the principal market marker computer." (R. 82, Pls.' App., Ex. 1 at 8.) TRG asks the Court to construe the terms "financial institution" and "interface." (R. 85, Def.'s Mem. at 21.) The Court rejects Plaintiffs' proposed construction and partially accepts the proposals set forth by TRG.

Plaintiffs' proposed construction is unacceptable because it imports limitations to the claim terms. Specifically, they seek to impermissibly insert the word "directly" into the construction of the claim. In their brief, Plaintiffs fail to clearly point to any support in the record indicating that a person of ordinary skill in the art would have understood the term "communications interface" as requiring an apparatus providing a direct connection. To the extent that Plaintiffs' argument depends upon a figure showing financial institutions accessing a PMM computer directly via a modem, it fails as the patent figures cannot be used to import claim limitations. *See, e.g., Playtex*, 400 F.3d at 907 (finding that a district court's reliance on figures to limit claim to a preferred embodiment was improper).

TRG relies upon a financial dictionary in defining the term "financial institution." (R. 85, Def.'s Mem. at 21 (citing Barron's Dictionary of Finance and Investment Terms 186-87 (4th ed.

1995).) Because this proposed construction reflects the term's ordinary and customary meaning, the Court construes "financial institution" to mean an "institution that collects funds from the public to place in financial assets such as stocks, bonds, money market instruments, bank deposits, or loans." (*Id.*)

Given the technical context in which it is used, the Court finds TRG's use of a general purpose dictionary to construe the term "interface" is inappropriate.[23] In the absence of any intrinsic evidence establishing its ordinary meaning, the Court relies upon a technical dictionary and construes the term "interface" as follows: "an electronic device that enables one piece of gear to communicate with or control another."[24]

## XIII. "[T]o manage risk"

Finally, Plaintiffs present the claim term "to manage risk" for construction and propose that the term be construed to mean "to control and direct the possibility of loss."[25] (R. 82, Pls.' Mem. at 25.) Since its definition is readily apparent, the Court will adopt Plaintiffs' general purpose dictionary-derived construction of the term "manage" as meaning "to control and

---

[23] TRG uses Merriam-Webster's Collegiate Dictionary and proposes that the term "interface" be construed to mean "the place at which independent and often unrelated systems meet and act on or communicate with each other." (R. 85, Def.'s Mem. at 21.)

[24] The Court relies upon the definition located in the McGraw-Hill Dictionary of Scientific and Technical Terms, which defines "interface" as "[s]ome form of electronic device that enables one piece of gear to communicate with or control another." *See* McGraw-Hill Dictionary of Scientific and Technical Terms 1093 (6th ed. 2002).

[25] TRG fails to provide a proposed construction of the term. (*See* R. 85, Def.'s Mem., Ex. 2.)

direct."[26] The Court, however, rejects the proposed definition of the term "risk" as it uses a general purpose dictionary to define a term that has a more precise meaning in the relevant art. Relying upon Barron's Dictionary of Finance and Investment Terms, the Court will construe the term "risk" as meaning the "measurable possibility of losing or not gaining value."[27] Accordingly, the Court construes "to manage risk" as follows: "to control and direct the measurable possibility of losing or not gaining value."

## CONCLUSION

The claim terms are construed in accordance with the constructions set forth above. This lawsuit is set for a status hearing on July 22, 2010 at 9:45 a.m. to discuss the future status of this litigation. The parties should exhaust all settlement possibilities in light of this opinion.

Entered: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** June 28, 2010

---

[26] Plaintiffs rely upon the most relevant definition of the word "manage" located in Webster's Third New International Dictionary. *See* Webster's Third New International Dictionary 1372 (1981) (defining "manage" as "to control and direct").

[27] *See* Barron's Dictionary of Finance and Investment Terms 491 (4th ed. 1995) (defining "risk" as "measurable possibility of losing or not gaining value").