# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE, INC., and BOARD OF TRADE OF THE CITY OF CHICAGO, INC., <br><br> Plaintiffs / Counterclaim Defendants, <br><br> v. <br><br> TECHNOLOGY RESEARCH GROUP, LLC, <br><br> Defendant / Counterclaim Plaintiff, <br><br> v. <br><br> CME GROUP, INC. <br><br> Counterclaim Defendant. | Case No. 1:09-cv-3895 <br><br> Judge Ruben Castillo |

**TECHNOLOGY RESEARCH GROUP LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING INEQUITABLE CONDUCT**

Technology Research Group, LLP ("TRG") respectfully submits this Memorandum in Support of its Motion for Summary Judgment Regarding Inequitable Conduct. The undisputed evidence demonstrates that the Chicago Mercantile Exchange, Inc., Board of Trade of the City of Chicago, Inc., and CME Group, Inc. (collectively "the CME") cannot prove inequitable conduct by clear and convincing evidence.

## INTRODUCTION

This case arises from TRG's assertion that the CME infringes United States Patent No. 5,963,923 ("the '923 patent"). The '923 patent claims an electronic trading system for trading commodities that includes "a principal market maker futures computer" and "a principal market maker options computer." The CME asserts that the '923 patent is unenforceable because, it alleges, the inventor – Howard B. Garber – and his counsel committed inequitable conduct before the United States Patent and Trademark Office ("PTO"). The CME asserts: (1) that Mr. Garber failed to disclose that the "principal market maker" rules, which are described in the patent, to the Patent Examiner, and (2) that Mr. Garber misled the Examiner to believe that human market makers were "completely foreign" to commodities trading. *See* Statement of Undisputed Facts ("SUF") ¶ 37.[1]

As set forth below, to succeed on its claim of inequitable conduct, the CME must demonstrate – by clear and convincing evidence – that the inventor, acting with intent to mislead the Examiner, withheld material information or submitted false material information to the PTO. The CME has not elicited evidence that would allow a jury to make either of the necessary

---

[1] In its Second Amended Complaint, the CME asserted that Mr. Garber engaged in inequitable conduct when he failed to disclose a document related to the Globex electronic trading system to the Examiner. *See* SUF ¶ 37. Mr. Garber testified that he was first made aware of the document underlying the CME's allegations by the CME's counsel in the prior litigation involving the '923 patent. *See id.* ¶ 39. The CME has not elicited any contrary evidence and appears to have abandoned this argument. As such, there are no facts to support a finding of inequitable conduct on that issue.

findings. In fact, the evidence demonstrates that all material information known to Mr. Garber was disclosed to the Patent Office and that Mr. Garber and his attorneys acted in good faith.

## FACTS

The '923 patent issued on October 5, 1999, and claims an electronic trading system that includes "a principal market maker futures computer" and "a principal market maker options computer." The crux of the invention is a system that combines the functions of an electronic commodities exchange (e.g., receiving, matching, and executing commodities trades and orders) and the functions of an electronic principal market maker (e.g., maintaining the market and maintaining a public order book).

The specification of the '923 patent makes clear that Mr. Garber does not claim to have invented the idea of an electronic exchange or the idea of a principal market maker. *See* SUF ¶¶ 11-15. Instead, the '923 patent specifically explained that electronic trading systems, including Globex, were "well known in the art and need not be discussed in further detail herein." *Id.* ¶ 15. The '923 patent specifically discloses that "[t]he use of a human market maker in a trading environment is known." *Id.* ¶ 11. The specification then discloses that the CME had proposed rules for a PMM Program but that the rules had never been implemented. *Id.* ¶ 12. The patent then describes how a PMM functions, including the requirement that the PMM continuously maintain the market, maintain an order book, and give priority to customer order execution over personal trading. *Id.* ¶ 14. Finally, the patent explains that a PMM receive priority volume benefits for fulfilling these functions. *Id.*

The '923 patent issued from application number 08/868,200 ("the '200 application"), which was filed on June 3, 1997. *Id.* ¶¶ 9, 29. On September 3, 1997, the '200 application was amended to incorporate by reference and claim priority to provisional application number

60/030,584 ("the provisional application"), which was filed on November 12, 1996.[2]  *Id.* ¶¶ 6, 16.  The provisional application consisted of a written description of the invention, a paper written by Mr. Garber, and figures showing the invention.  *Id.* ¶ 6.  The provisional application disclosed that the CME's PMM Program was a "pilot program" that was incorporated into CME Rule 556.  *Id.* ¶ 7.  That application also described the program and included a copy of CME Rule 556.  *Id.*  The provisional application disclosed that the CME had attempted one other market maker program in the past – a program of paying market makers – but that the program had failed.  *Id.* ¶ 8.

On February 18, 1998, the Patent Examiner issued an Office Action ("the First Office Action"), rejecting all 51 claims of the '200 application.  *Id.* ¶ 17.  Among other things, in the First Office Action, the Examiner concluded that the invention set out in the '200 application was anticipated by United States Patent No. 4,677,552 ("Sibley '552") and United States Patent No. 5,168,446 ("Wiseman '446").  *Id.* ¶ 18.

Mr. Garber's attorneys responded to the First Office Action on May 18, 1998.  *Id.* ¶ 19.  They explained that one aspect of the system claimed by the '200 application was a principal market maker computer that maintains the markets.  *Id.* ¶ 20.  Mr. Garber's attorneys argued that neither Sibley '552 nor Wiseman '446 disclosed a computerized market maker.  *Id.*  The attorneys explained that these patents did not disclose such a system because "[t]he concept of a market maker or specialist, whether human or computerized, is completely foreign to the trading of commodities."  *Id.* ¶ 21.

On August 18, 1998, the PTO issued a second Office Action ("the Second Office Action"), allowing eight of the claims but continuing to reject the remaining claims.  *Id.* ¶ 22.

---

[2] The '200 application was amended again a little over a year later to remove the incorporation by reference and to simply claim priority to the provisional application.  *See id.* ¶ 24.

3

The PTO accepted the argument that Sibley '552 and Wiseman '446 did not anticipate the '200 application, but concluded that much of the '200 application was anticipated or rendered obvious by United States Patent No. 4,903,201 ("Wagner '201"). *Id.* ¶ 23. After further arguments by Mr. Garber's attorneys, the Examiner issued a third Office Action ("the Third Office Action") on December 23, 1998. *Id.* ¶ 26. In the Third Office Action, the Examiner rejected claims noting that electronic trading and computerized market making were known in the art. *Id.* ¶ 27.

On March 10, 1999, Mr. Garber's attorneys filed a response to the Third Office Action, cancelling the rejected claims and making technical amendments to certain claims, clearing the way for the '923 Patent to issue. *Id.* ¶ 28.

At the claim construction phase, the CME relied upon the provisional patent application to argue that the term "principal market maker" should be defined to mean an entity that performs three functions: (1) to continuously maintain the market, (2) to maintain a public order book, and (3) to give priority to customer order execution over personal trading. *See id.* ¶ 33. Adopting the CME's argument, this Court concluded that the provisional patent application was part of the "record of the proceedings before the USPTO leading to the issuance of the '923 patent" and could therefore be considered part of the prosecution history. *Id.* ¶ 34. This Court relied upon the provisional application to construe the term "principal market maker." *Id.* ¶ 35.

## STANDARD OF REVIEW

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant carries the initial burden to show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party makes that initial showing, the non-movant must "go beyond the pleadings" and present

4

competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

In considering a motion for summary judgment, the Court must be mindful of the burden and standard of proof that will apply to the claim at trial. *See id.* at 255. Under 35 U.S.C. § 282, an issued patent is presumed valid, which "places the burden of proof of facts, and the ultimate burden of persuasion to establish invalidity" on the party challenging the patent. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 885 (Fed. Cir. 1988). Moreover, a party challenging the validity of a patent, including based upon inequitable conduct, must establish its invalidity by clear and convincing evidence. *See, e.g., Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990); *Lindermann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed. Cir. 1984). "Clear and convincing" evidence "means evidence that convinces you that it is highly probable that the particular proposition is true." Seventh Circuit Pattern Jury Instruction § 11.3.1.

## **ARGUMENT**

TRG is entitled to summary judgment on the CME's inequitable conduct claims. The doctrine of inequitable conduct stems from the fact that inventors and their representatives owe a duty of candor and good faith to the Patent Office. Under 37 C.F.R. § 1.56(a), when interacting with the PTO: "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith." In light of this duty, "[a] patent may be

5

rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 913 (Fed. Cir. 2007) (internal quotations omitted). The *McKesson* court explained that, "[t]he party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." *Id.* The "materiality" and "intent" requirements are independent, and a party claiming inequitable conduct must establish each element. *See Allen Organ Co. v. Kimball Int'l, Inc.* 839 F.2d 1556, 1567 (Fed. Cir. 1988) ("Materiality does not presume intent, which is a separate and essential component of inequitable conduct.").

The materiality element has two subparts. First, the party claiming inequitable conduct must prove that the inventor withheld information from the Patent Office. This analysis focuses on the actions of the inventor; the question is whether the information was "disclosed," not whether the Examiner considered the information. *See, e.g., Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 921 n.25 (D. Minn. 2010) (stating that "it is whether a reference was disclosed, not whether it was considered, that is relevant to inequitable conduct"). Second, assuming information was not disclosed, the party challenging the patent must prove that the information is "material." Although different standards have been applied to the "materiality" element, the most easily proven that has been approved by the Federal Circuit is the "reasonable examiner" standard. *See Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1316 (Fed. Cir. 2006). Under this standard, information is "material" if "a reasonable examiner would have considered such prior art important in deciding whether to allow the patent application." *Id.* at 1314. Information that is "cumulative" to what is before the Patent Examiner is not "material." *See Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1327

6

(Fed. Cir. 2009) ("However, a withheld otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner.").

The party asserting inequitable conduct must also demonstrate that the inventor acted with intent to deceive the Patent Examiner. "Intent" is defined as the "[d]esign, resolve, or determination with which [a] person acts or [a] state of mind in which a person seeks to accomplish a given result through a course of action." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995) (internal quotations omitted). "While intent to deceive the PTO may be found as a matter of inference from circumstantial evidence, circumstantial evidence cannot indicate merely gross negligence." *Id.* at 1181. And, in considering the "intent" requirement, a court should consider the overall conduct of the inventor during the prosecution, including evidence that demonstrates good faith. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988). "[T]he fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008).

The undisputed facts undermine the CME's claims. The evidence demonstrates that Mr. Garber did not withhold any information and that he acted in good faith.

**I.   The CME's Arguments Related To The PMM Rules Do Not Demonstrate Inequitable Conduct.**

In its Second Amended Complaint, the CME asserts that Mr. Garber engaged in inequitable conduct because, during the prosecution of the '200 application, he "did not disclose the rules or any other documentation for the CME's PMM program." Second Amended Complaint ("Complaint") ¶ 70. The CME explained that these rules were "highly material" because they disclosed that a PMM is "required to (1) continuously maintain a two-sided market in the products, (2) be responsible for maintaining the order book of customer limit orders with

respect to those products, and (3) accord priority to customer order execution over his activity as a market maker, in return for guaranteed participation on each transaction." Complaint ¶ 72(a).

The undisputed evidence demonstrates that the CME cannot succeed on this claim. The CME cannot meet either the materiality or the intent prong because: (a) Mr. Garber and his attorneys disclosed the PMM program, including the aspects of the program deemed "highly material" by the CME, to the Examiner; and (b) there is no evidence upon which a finder of fact could conclude that Mr. Garber intended to deceive the Examiner.

### A. The Evidence Demonstrates That All Material Information Was Disclosed.

The most fundamental shortcoming of the CME's argument is that the "highly material" information the CME contends was withheld *is disclosed in the specification of the patent*. In the "Background of the Invention" section, Mr. Garber describes the existing art. He notes that "[t]he use of human market makers in a trading environment is known." SUF ¶ 11. One line later, in the same paragraph, the specification describes that the CME had proposed rules for a PMM program but that those rules had not been implemented. *Id.* ¶ 12. In the two paragraphs that follow, the patent describes the PMM program. *Id.* ¶ 14. The description of the PMM program in the specification discloses each of the facts that the CME contends is "highly material." *Compare* Complaint ¶ 72(a) *with* '923 Patent, col. 1, lines 35-49. Thus, the undisputed evidence demonstrates that Mr. Garber disclosed that the concept of a PMM "is known" (*i.e.,* that it is prior art) and described the components of the PMM program.

Moreover, Mr. Garber disclosed additional information about the PMM program to the PTO in his provisional patent application. As the CME recognizes, Mr. Garber "included the text of [the CME's PMM] rule in the '584 provisional application." Complaint ¶ 58. In the provisional application, Mr. Garber also explained that the PMM program is a "pilot program" included in CME Rule 556. SUF ¶ 7. Mr. Garber disclosed the provisional application when he

8

amended the '200 application to incorporate the earlier application by reference. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) ("When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein.").[3] The Patent Examiners "verified" the provisional application on the face of the '200 application.[4]

After TRG pointed out that the CME's arguments could not survive in the face of the information disclosed in the specification of the patent, much less the information contained in the provisional application, the CME changed its argument. Based upon the report prepared by and the testimony of the CME's expert – Paul Janicke – it appears that the CME no longer asserts that the substance of the rules was withheld. Instead, the CME now asserts that Mr. Garber failed to disclose that the rules had been "published," so the Examiner was not aware that the PMM was prior art. *Id.* ¶¶ 42-43.

The CME's new argument cannot survive scrutiny. The description of the PMM program in the provisional application disclosed that the PMM rules were published; it described the PMM program as a "pilot program" that was incorporated in CME Rule 556. Thus, Mr. Garber disclosed that the PMM program had been set forth in a publication: the CME Rules. Moreover,

---

[3] Although the incorporation by reference was changed to a claim of priority, the provisional application was "disclosed" when the '200 application was amended to include the incorporation by reference.

[4] The CME now disputes that the disclosure of the information in the provisional application puts the information before the Examiner. The CME is barred from making this argument by the doctrine of judicial estoppel, which "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000); *see also New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). At claim construction, the CME discussed the provisional application as part of the prosecution history and expressly argued that the Court should consider the provisional application in construing the claims. *See* SUF ¶ 33. This Court accepted the CME's argument, relying upon the provisional patent application to define the term "principal market maker." *Id.* ¶ 35. This Court expressly noted that the provisional application "is part of the complete record of the proceedings before the USPTO leading to the issuance of the '923 patent" and could thus be considered part of its prosecution history. *Id.* ¶ 34. In light of its use of the provisional application to succeed on an issue at claim construction, the CME should not be allowed to argue now that the provisional patent application was not disclosed to the Patent Office.

the specification of the patent includes the description of the PMM program – including each of the "highly material" aspects of the program – in a discussion of what "is known" in the art. In light of this description, the CME cannot sustain its burden of showing by clear and convincing evidence that Mr. Garber withheld that the PMM rules were prior art from the Patent Office.

### B. The CME Cannot Demonstrate That Mr. Garber Intended To Deceive The Examiner.

Even if the CME could demonstrate that material information was withheld from the Examiner – and it cannot – the evidence does not support a finding that Mr. Garber intended to deceive the Patent Office. The CME has not and cannot point to any evidence – direct or circumstantial – that Mr. Garber, or his attorneys, intended to deceive the Examiner.[5] The overall course of the prosecution demonstrates that Mr. Garber and his attorneys proceeded in good faith. *See Kingsdown*, 863 F.2d at 876 (stating that the overall course of conduct, including evidence of good faith, should be considered).

First, the disclosure of the existence of the PMM program in the specification disproves the CME's allegation that Mr. Garber intended to deceive the PTO. Evidence that an inventor includes a reference to a prior art system in the specification of a patent – even if the description is incomplete – undercuts a finding of intent. In *Grantley Patent Holdings, Ltd. v. Clear Channel Communications, Inc.*, a district court faced such a situation. 540 F. Supp. 2d 724, 730 (E.D. Tex. 2008). The inventor had disclosed the existence of an "inventory management system" in the specification of a patent. *Id.* The infringing party claimed that the inventor "did *not* tell" the PTO about a certain aspect of the system. *Id.* (emphasis in original). The court

---

[5] The CME's expert witness, Paul Janicke, did not offer any opinion on intent. *See* SUF ¶ 46. Mr. Janicke stated that there was nothing "improper" about the manner that the '200 application claimed priority to the provisional application. *Id.* Mr. Janicke also stated he had no reason to believe that Mr. Garber would believe that the Examiner would not review the provisional application. *See id.*

concluded that the infringer could not demonstrate that the inventor intended to deceive the Examiner: "there is no evidence that [the inventor] made a deliberate decision to withhold a known material reference when he explicitly incorporated the reference into the specifications of the patent-in-suit." *Id.* (*citing Am. Corp. v. Gabriel Elec., Inc.*, 847 F.2d 819, 823-24 (Fed. Cir. 1988) (affirming decision that inequitable conduct was not shown where prior art was "disclosed generically in the patent application")). This concept is based upon common sense; if an inventor intends to deceive the Examiner, it is highly unlikely that the inventor would disclose any aspect of the prior art system at issue.[6]

Consistent with *Grantley Patent Holdings*, Mr. Garber cannot be found to have intended to deceive the Patent Office. Mr. Garber expressly described the PMM rules, including the portions that the CME asserts to be material, in the specification of the '923 patent. And, he included this description almost immediately after stating that market making "is known" in the art. This evidence disproves the CME's contention that Mr. Garber intended to deceive the Examiner into believing that the PMM program was not prior art.

Second, Mr. Garber's citation to his provisional application, which described the PMM Program as a "pilot program" that was incorporated into CME Rule 556 further disproves the CME's inequitable conduct claim. Courts have found that, when an inventor incorporates by reference a prior application that refers to the allegedly undisclosed matter, the inventor cannot intend to deceive the Patent Office. *See, e.g., Am. Med. Sys., Inc.*, 712 F. Supp. 2d at 921 ("Because Davis incorporated the Fletcher application by reference, no reasonable finder of fact

---

[6] Disclosing any aspect of a prior art reference or system creates a very real risk that the inventor will be forced to disclose any withheld information about the system. Under the patent rules, a Patent Examiner may ask an inventor for additional information during the review of a patent application. *See* 37 C.F.R. § 1.105 (setting out that a Patent Examiner may require the submission of additional information that is "reasonably necessary to properly examine or treat the matter"). Thus, a disclosure of any aspect of a prior art system is inconsistent with the conclusion that the inventor intends to deceive the Examiner about the existence of or prior art status of the partially disclosed system.

could conclude that Davis intended to deceive the USPTO."); *Grantley*, 540 F. Supp. 2d at 732 (stating that inventor's incorporation of a document by reference "is inconsistent with any intent to deceive"). These cases apply directly here, where Mr. Garber initially incorporated his provisional patent by reference – putting the information before the Examiner. Moreover, these cases generally stand for the proposition that an inventor who points the Examiner to a source that discloses the allegedly withheld reference cannot be found to have intended to deceive. Here, Mr. Garber unquestionably pointed the Examiner to his provisional application, including the further description of the PMM program. This action is inconsistent with the conclusion that Mr. Garber intended to mislead the Examiner.

In light of the evidence, no reasonable finder of fact could conclude by clear and convincing evidence that Mr. Garber withheld the fact that the PMM rules had been published with the intent to deceive the Examiner into concluding that they were not relevant prior art. As such, TRG is entitled to summary judgment on the CME's inequitable conduct claim.

## II. The CME Cannot Prove Inequitable Conduct Based Upon An Alleged "Misstatement."

The CME also alleges that Mr. Garber – through his attorneys – made a material misstatement during the prosecution history. Specifically, in arguing that the invention was not anticipated by Sibley '552, Mr. Garber's attorneys argued:

> Nowhere [does Sibley '552] refer to any computer or other mechanism <u>acting as a market maker or specialist for trading any commodity</u>. The reason for that is simple. The concept of a market maker or specialist, whether human or computerized, is completely foreign to the trading of commodities.

SUF ¶ 21. Mr. Garber's attorneys made a similar statement in arguing that the invention was not anticipated by Wiseman '446. The CME argues that Mr. Garber incorrectly stated that human market makers were "completely foreign to the trading of commodities." *See* Complaint ¶¶ 67-

71. Although there is a factual dispute regarding the accuracy of this statement,[7] TRG is entitled to summary judgment on this claim because the CME cannot establish that the alleged misstatement was material or that Mr. Garber intended to deceive the Examiner.

### A. The Evidence Demonstrates That There Was No Material Misstatement.

The CME cannot demonstrate that the alleged misstatement was "material." As the CME's expert admitted, the information underlying the alleged misstatement was cumulative to the references before Examiner. The Examiner was aware of, and relied upon, a reference that the Examiner construed as disclosing computerized market making for commodities. SUF ¶ 45. The CME's expert conceded that the reference cited by the Examiner was closer to the claimed invention because it related to computerized market making rather than human market makers. *Id.* Because the Examiner was aware of a reference that disclosed computerized market making, any statement about human market making was cumulative and, therefore, not material.

The CME's only allegation about the materiality of the statement is that it resulted in the Examiner withdrawing the rejections based upon Sibley '552 and Wiseman '446. *See* SUF ¶ 44. The CME's argument is without merit assertion is without merit because the CME concedes Mr. Garber's attorneys truthfully stated that neither of those patents disclosed a computerized market maker. Specifically, the CME did not assert in its Second Amended Complaint that either Sibley '552 or Wiseman '446 disclosed a computer acting as a market maker or specialist. *See* SUF ¶ 38. In the face of this concession, the CME cannot demonstrate that the alleged misstatement was material to the withdrawal of the rejections. Because neither Sibley '552 nor Wiseman '446

---

[7] The evidence demonstrates that Mr. Garber was aware of two market maker programs in the commodities world, both of which had failed. First, he was aware of the PMM program, which was never implemented. Second, he was aware of a failed program in which the CME paid market makers to maintain currency markets. TRG contends that Mr. Garber's knowledge of two *failed* market makers programs supports, rather than contradicts, the statement that market making was foreign to the commodities world.

13

anticipated the claims at issue, the Examiner was required to withdraw the § 102 rejection based upon those patents. In considering whether a claim is anticipated, the only question before an Examiner is whether the prior art reference contains each and every limitation of the claim at issue. If the prior art patent does not include every element of the claimed system, there is no anticipation. *See* SUF ¶ 47; Seventh Circuit Pattern Jury Instruction § 11.1.13. The CME concedes that the § 102 rejection based upon Sibley '552 and Wiseman '446 was improper and, therefore, concedes that the Examiner was required to withdraw the rejections.

**B.     The CME Cannot Demonstrate That Mr. Garber Intended To Deceive The Examiner.**

The CME cannot meet its burden of showing by clear and convincing evidence that Mr. Garber intended to deceive the Examiner. Mr. Garber expressly disclosed that "[t]he use of a human market maker in a trading environment is known." SUF ¶ 11. Mr. Garber also disclosed that the CME had proposed rules for a human market maker system. *Id.* ¶ 12. Indeed, the fact that the CME's *only* evidence of intent comes from statements in the prosecution history undermines the CME's position. As set forth above, courts have generally held that an applicant who discloses the allegedly withheld information at some point during the prosecution history cannot be held to have intended to deceive the Examiner. This is especially true where, as here, the party challenging the patent points to two statements about an issue that is, at most, of marginal materiality in a file history that spans more than 400 pages. Taken as a whole, this evidence will not support a finding, by clear and convincing evidence, that Mr. Garber intended to deceive the Examiner.

## CONCLUSION

The CME's inequitable conduct claims fail because the CME cannot demonstrate either that Mr. Garber withheld material information from the Patent Office or that he intended to

14

deceive the Examiner. Because the CME cannot establish either of the elements of an inequitable conduct claim, TRG is entitled to summary judgment.

Dated: March 18, 2011　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　/s/ Robert A. Klinck
　　　　　　　　　　　　　　　　　　　　　　Daniel Kotchen
　　　　　　　　　　　　　　　　　　　　　　Daniel L. Low
　　　　　　　　　　　　　　　　　　　　　　Robert A. Klinck
　　　　　　　　　　　　　　　　　　　　　　Alicia Gutierrez
　　　　　　　　　　　　　　　　　　　　　　Kotchen & Low LLP
　　　　　　　　　　　　　　　　　　　　　　2300 M Street NW, Ste. 800
　　　　　　　　　　　　　　　　　　　　　　Washington, DC  20037
　　　　　　　　　　　　　　　　　　　　　　(202) 416-1848
　　　　　　　　　　　　　　　　　　　　　　(202) 280-1128 (fax)

　　　　　　　　　　　　　　　　　　　　　　Robert M. Mason
　　　　　　　　　　　　　　　　　　　　　　Mason & Petruzzi
　　　　　　　　　　　　　　　　　　　　　　13601 Preston Rd.
　　　　　　　　　　　　　　　　　　　　　　Suite 402W
　　　　　　　　　　　　　　　　　　　　　　Dallas, Texas 75240
　　　　　　　　　　　　　　　　　　　　　　(972) 788-1500
　　　　　　　　　　　　　　　　　　　　　　(972) 788-1561 (fax)

　　　　　　　　　　　　　　　　　　　　　　James D. Petruzzi
　　　　　　　　　　　　　　　　　　　　　　Mason & Petruzzi
　　　　　　　　　　　　　　　　　　　　　　4900 Woodway Rd., Ste. 745
　　　　　　　　　　　　　　　　　　　　　　Houston, Texas 77056
　　　　　　　　　　　　　　　　　　　　　　(713) 840-9993
　　　　　　　　　　　　　　　　　　　　　　(713) 877-9100 (fax)

　　　　　　　　　　　　　　　　　　　　　　Daryl M. Schumacher
　　　　　　　　　　　　　　　　　　　　　　Kopecky, Schumacher & Bleakley, P.C.
　　　　　　　　　　　　　　　　　　　　　　203 N. LaSalle Street  Ste. 1620
　　　　　　　　　　　　　　　　　　　　　　Chicago, IL  60601
　　　　　　　　　　　　　　　　　　　　　　(312) 380-6556
　　　　　　　　　　　　　　　　　　　　　　(312) 324-0666 (fax)

　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Technology Research Group, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that, on March 18, 2011, he caused true and correct copies of the foregoing document to be served upon all counsel of record via the Court's CM/ECF System.

/s/ Daryl M. Schumacher

*Attorney for Technology Research Group, LLC*