UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE, INC.<br>and BOARD OF TRADE OF THE<br>CITY OF CHICAGO, INC.,<br><br>    Plaintiffs/Counterclaim Defendants,<br><br>    v.<br><br>TECHNOLOGY RESEARCH GROUP, LLC,<br><br>    Defendant/Counterclaim Plaintiff,<br><br>    v.<br><br>CME GROUP, INC.,<br><br>    Counterclaim Defendant. | No. 09 C 3895<br><br>Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

Chicago Mercantile Exchange, Inc. ("CMEI") and the Board of Trade of the City of Chicago ("CBOT") (collectively, "Plaintiffs") filed this patent action against Technology Research Group, LLC ("TRG"), seeking declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* (R. 121, Second Am. Compl.) Specifically, Plaintiffs seek a declaration that United States Patent No. 5,963,923 ("'923 patent") is invalid and unenforceable. (*Id.* ¶¶ 37-88.) Additionally, Plaintiffs seek a declaration that they have not directly or indirectly infringed the '923 patent. (*Id.* ¶¶ 27-39.) TRG has also filed a patent infringement counterclaim against Plaintiffs and CME Group, Inc. ("CMEG") (collectively, "CME"). (R. 47, TRG's Am. Countercl.) Presently before the Court is CME's motion for

1

summary judgment of noninfringement of all asserted claims of the '923 patent. (R. 161, CME's Mot.) For the reasons stated below, the motion is denied.

## BACKGROUND[1]

### I.     '923 patent

The '923 patent issued on October 5, 1999 and is titled "System And Method for Trading Having a Principal Market Maker." (R. 196, TRG's Resp. to CME's N.D. Ill. L.R. 56.1 Statement ¶ 7.) In the present litigation, TRG is only asserting claims 9-11 of the '923 patent. Claims 9-11 of the '923 patent claim:

> 9. A principal market maker system for trading commodities, comprising:
> a principal market maker futures computer operative to receive and automatically execute primary commodity purchase and sale trades and orders and maintain a commodity futures bid and offer market;
>
> a principal market maker options computer operative to receive and automatically execute secondary commodity purchase and sale trades and orders and maintain a commodity options bid and offer market; and
>
> a bi-directional communications link coupled between the futures and options computers, the bi-directional communications link to facilitate intermarket trading to manage risk taken in a position resulting from a trade in either market.
>
> 10. An electronic market for trading commodities, comprising:
> a communications interface operative to transmit commodity bids and offers from at least one financial institution;
>
> a principal market maker computer coupled to the communications interface, the principal market maker computer operative to receive the commodity bids and offers and execute trades to maintain a market for commodity trades; and
>
> a principal market maker options computer.

---

[1] The Court takes the undisputed facts from the Local Rule 56.1 Statements submitted by the parties.

2

> 11. The electronic market defined in claim 10, further comprising a bi-directional communications link coupled between the options computer and the principal market maker computer.

'923 patent, col. 11, ll. 11-41.

On June 28, 2010, the Court issued a Memorandum Opinion and Order construing various claims of the '923 patent. *Chi. Mercantile Exch., Inc. v. Tech. Research Grp., LLC*, 721 F. Supp. 2d 785, 788-92 (N.D. Ill. 2010). Notably, the Court construed the claim term "principal market maker" as follows:

> an entity required to provide the following functions: (1) continuously maintain a two-sided bid/offer market of specified size and spread for its designated product(s); (2) maintain a public order book with respect to these assigned products; and (3) give priority to customer order execution over personal trading. As compensation for the fulfillment of these responsibilities, this entity is to receive priority volume benefits.

*Id.* at 794.

Additionally, the Court provided the following constructions: (1) "computer" as a programmable electronic device that can store, retrieve, and process data."; (2) "execute" as "to carry out fully and completely"; (3) "order" as "instruction to a broker or dealer to buy or sell securities or commodities"; (4) "link" as "a unit in a communication system"; and (5) "coupled" to mean "to join for combined effect." *Id.* at 795-803.

## II. Infringement allegations

TRG contends that CME infringes independent claims 9 and 10 and dependent claim 11 of the '923 patent under 35 U.S.C. § 271(a) by making and using the patented system for electronic trading including principal market maker functionality that is claimed in the '923 patent. (R. 196, TRG's Resp. to CME's N.D. Ill. L.R. 56.1 Statement ¶ 19.) TRG argues that the following systems infringe, or have infringed, the asserted claims: (1) CME's Globex/iLink

system, which is the current version of Globex; (2) CME's Globex/HipHop system, which is a prior version of Globex; and (3) e-CBOT, which is a system that was operated by CBOT before its merger into the CME. (*Id.* ¶ 23.)

According to TRG, these systems infringed claims 9 and 10 of the '923 patent by, *inter alia*, (1) continuously maintaining a two-sided bid/offer market of specified size and spread for a designated product; and (2) giving priority to customer order execution over personal trading. (*Id.* ¶¶ 24-25, 28-29, 32-33.) Additionally, TRG argues that these systems infringed claim 9 by, *inter alia*, containing a bi-directional communications link coupled between the futures and options computer. (*Id.* ¶¶ 26, 30, 34.) Finally, TRG maintains that these systems infringe claim 11 by, *inter alia*, containing a bi-directional communications link coupled between the options computer and principal market maker computer. (*Id.* ¶¶ 27, 31, 35.)

TRG contends that Globex became an infringing system in or around February 2002, when CME recruited certain entities known as "Lead Market Makers" and programmed Globex to award priority volume benefits to those market makers. (R. 164, CME's Summ. J. R., Ex. B at 2.) Globex, TRG asserts, has continued to infringe claims 9-11 of the '923 patent without interruption since that time. (*Id.*) Similarly, TRG argues that e-CBOT became an infringing system in or around May 2004, when CBOT recruited entities known as "Electronic Market Makers" and programmed e-CBOT to award priority volume benefits to those market makers. (*Id.*) The e-CBOT system, TRG maintains, continued to infringe claims 9-11 of the '923 patent without interruption until it was decommissioned. (*Id.*)

## PROCEDURAL HISTORY

On November 10, 2010, Plaintiffs filed a second amended complaint in which they

4

request: (1) declaratory judgment of noninfringement of the '923 patent by CMEI; (2) declaratory judgment of noninfringement of the '923 patent by CBOT; (3) declaratory judgment of invalidity of the '923 patent by CME; and (4) declaratory judgment of unenforceability of the '923 patent by CME. (R. 121, Second Am. Compl. ¶¶ 27-88.)

In March 2011, CME filed a motion for summary judgment of noninfringement of all asserted claims of the '923 patent. (R. 152, CME's Mot.) Summary judgment, CME asserts in its supporting memorandum, is appropriate for three reasons. First, CME argues that the accused systems do not infringe the '923 patent because they "do not 'continuously' maintain a two-sided bid/offer market." (R. 162, CME's Mem. at 6-9.) Second, it contends that the accused systems are not required to "give priority to customer order execution over personal trading, they cannot infringe any of the asserted claims of the '923 patent." (*Id.* at 9-12.) Third, CME maintains that since "TRG has cited no evidence that the accused systems include or use a bi-directional link that allows two-way communications between the futures computer and the options computer, TRG cannot prove that the overall accused systems (including both CME's systems and the market makers' systems) literally infringe claims 9 or 11 of the '923 patent as construed by the Court." (*Id.* at 15.)

## LEGAL STANDARD

"Summary judgment is as available in patent cases as in other areas of litigation." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011) (citation omitted). It is well-established that summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In

determining whether there is a genuine issue of material fact, courts must view the evidence in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant. *Leggett & Platt, Inc. v. VUTek, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge its initial responsibility by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the nonmoving party has the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323.

Once a properly supported motion for summary judgment is made, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial; raising some metaphysical doubt as to the material facts is not enough. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). When evaluating a motion for summary judgment, a court views the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits. *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-53 (1986)).

Summary judgment of no literal infringement is proper when, construing the facts in a manner most favorable to the nonmovant, no reasonable jury could find that the accused system meets every limitation recited in the properly construed claims. *Catalina Mktg. Int'l, Inc. v.*

*Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002). The patentee has the burden of proving infringement by a preponderance of the evidence. *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004) (citation omitted). Since the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by: (1) providing evidence that would preclude a finding of infringement; or (2) by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case. *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citation omitted). Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims. *Id.* Stated differently, summary judgment of noninfringement is "appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (citation omitted). A district court's determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Catalina*, 289 F.3d at 812.

## ANALYSIS

A patent infringement analysis involves two steps: (1) claim construction; and (2) application of the properly construed claim to the accused product. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001). To prove infringement, the patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents. *Catalina*, 289 F.3d at 812 (citing *Seal Flex, Inc. v. Athletic Track and*

*Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 2002)). "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim." *Id.* (citing *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)). Infringement under the doctrine of equivalents requires the patentee to prove that the accused device contains an equivalent for each limitation not literally satisfied. *Id.* (citing *Dawn Equip. Co. v. Ky. Farms*, 140 F.3d 1009, 1015 (Fed. Cir. 1998)).

Here, CME contends that summary judgment is proper because three of the '923 patent's claim limitations are not present in the allegedly infringing systems. The Court will examine each of CME's arguments in turn.

## I. "Continuously maintain" limitation

All asserted claims of the '923 patent require at least one principal market maker computer. *See* '923 patent, col. 11, ll. 11-41. To qualify as a principal market maker, the accused systems are required to, *inter alia*, "continuously maintain a two-sided bid/offer market of specified size and spread for its designated product(s)." According to CME, "there is no evidence that the accused systems meet this limitation when it is properly construed, because they are not required to and do not 'continuously' maintain a two-sided bid/offer market." (R. 162, CME's Mem. at 6.) For this reason, it asserts that summary judgment is appropriate.

In response, TRG contends that the allegedly infringing systems do "continuously maintain" a market because: (1) CME contracts with market makers to maintain markets by continuously posting bids and offers on electronic trading systems; and (2) there was a class of market makers who, while not posting bids and offers, did respond to requests for quotes. (R. 196, TRG's Mem. at 3-8.) Whether either contention can help TRG withstand CME's motion

for summary judgment is the question to which the Court now turns.

## A.     Market maker contracts

Prior to examining whether CME's contracts with market makers can meet this limitation, the Court must clarify what the term "continuously" means. According to CME, "the 'continuously' limitation requires the infringing market makers to maintain a two-sided bid/offer market (*i.e.*, provide quotes) throughout the entire time period a product is available for trading." (R. 162, CME's Mem. at 7.) TRG, on the other hand, contends that the "word 'continuously' does not mean during the entire period for which a product is traded." (R. 196, TRG's Mem. at 4.) Rather, it asserts that the "natural meaning of 'continuously' is without interruption for some period of time, *i.e.*, not sporadically." (*Id.*) This interpretive issue is a matter of claim construction, and is therefore an issue the Court must determine as a matter of law. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005).

Here, CME points to portions of the specification and to the testimony of Patrick Gambaro ("Gambaro") in support of its proposed interpretation of the term "continuously." (R. 162, CME's Mem. at 8.) The Court need not, however, examine whether these pieces of the record support its interpretation. Instead, the Court finds that the term has a definition that is not tied to a specific meaning in the field of art. Additionally, the Court notes that the inventor did not act as his own lexicographer in redefining the meaning of this claim term away from its ordinary meaning. *See Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). Thus, the Court can rely upon dictionaries to determine the proper interpretation of this term. *See Phillips*, 415 F.3d at 1314.

One dictionary defines the adjective "continuous" as "marked by an uninterrupted

extension in space, time, or sequence." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/continuously (last visited May 23, 2011). Another dictionary defines the word "continuously" as "[i]n a continuous manner; uninterruptedly; without break; continually; constantly." Oxford English Dictionary, http://www.oed.com/viewdictionaryentry/Entry/40281#footerWrapper (last visited May 23, 2011). This same dictionary defines "continuous" as "[c]haracterized by continuity; extending in space without interruption of substance; having no interstices or breaks; having its parts in immediate connection; connected, unbroken." Oxford English Dictionary, http://www.oed.com/view/Entry/40280#eid8456638 (last visited May 23, 2011). With the aid of these definitions, the Court concludes that the word "continuously" in this context means "without interruption or break for a period of time." CME's effort to define this period of time as necessarily being the entire period for which a product is traded is unavailing.[2]

Given this interpretation, the Court finds that a reasonable jury could conclude that the "continuously maintain" limitation has been met. The record indicates that CME has entered into numerous contracts with market makers that require market makers to maintain markets by posting bids and offers. Many of these contracts use the word "continuous" or "continuously" to describe the market maker's contractual obligation to provide a two-sided bid/market for a specified product. (*See, e.g.*, R. 196, TRG's Resp. to CME's N.D. Ill. L.R. 56.1 Statement, Exs.

---

[2] As an additional observation, the Court notes that CME's position is also undermined by the language contained in some of the market maker contracts in the record. (*See, e.g.*, R. 196, TRG's Resp. to CME's N.D. Ill. L.R. 56.1 Statement, Ex. 35 (noting that the market maker would quote prices "continuously" for at least 90% of regular trading hours).) While certainly not dispositive, the usage of the words "continuous" and "continuously" in various market maker contracts suggests that people skilled in the relevant art may have understood these words in their ordinary sense.

34, 37.) Because of the presence of this evidence in the record, the Court finds that a reasonable jury could conclude that the accused systems continuously maintain two-sided bid/offer markets, and therefore satisfy the "continuously maintain a two-sided bid/offer market of specified size and spread for its designated product(s)" limitation. CME's challenge thus fails to persuade the Court to grant summary judgment of noninfringement.

CME presents three primary arguments in support of its position. First, it contends that summary judgment is proper because these market makers did not maintain a market "throughout the entire time period a product is available for trading." (R. 162, CME's Mem. at 8.) In light of the Court's clarification of the meaning of the word "continuously," this argument is undeserving of further attention. Second, CME asserts that the "mere existence of contractual obligations between CME and a market maker is insufficient to establish actual use of the accused system, because a contract itself does not prove performance of the contract." (R. 210, CME's Reply at 10 (citing *Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364, 1370 (Fed. Cir. 2010)).) While CME is correct in noting that a contractual relationship is not, by itself, enough to show that these market makers actually did what they promised to do in their respective contracts, a reasonable jury could infer, based on the documented relationship between market makers and liquidity, (*see, e.g.*, TRG's Resp. to CME's N.D. Ill. L.R. 56.1 Statement, Ex. 31), that at least some of these market makers fulfilled their contractual obligations. This argument therefore also fails to persuade the Court.

Finally, CME contends that summary judgment is proper because "there is no evidence of any market maker's computers being programmed to post bids and offers throughout the entire time that a product is available for trading." (R. 162, CME's Mem. at 9.) According to CME,

11

"[s]ince TRG has no evidence that the accused systems are programmed to 'continuously' maintain a two-sided bid/offer market, TRG cannot prove that the overall accused systems infringe any asserted claims of the '923 patent as construed by the Court." (*Id.*) What is conspicuously missing from this argument, however, is any link to either the '923 patent language or the Court's construction of the patent requiring that the accused systems actually be programmed to "continuously maintain a two-sided bid/offer market." Because this argument is insufficiently grounded in the language of the '923 patent or its construction, it fails to persuade the Court.

In sum, the Court concludes that a reasonable jury could conclude that the accused systems continuously maintain two-sided bid/offer markets, and therefore satisfy the "continuously maintain" limitation. Given this conclusion, the Court need not consider whether market makers who only responded to requests for quotes could satisfy the "continuously maintain" limitation.

## II. Customer order limitation

CME also argues that summary judgment of noninfringement of all asserted claims is proper because the accused systems do not meet a second requirement of the Court's "principal market maker" construction. Specifically, CME maintains that in addition to continuously maintaining a two-sided bid/offer maker, to qualify as a principal market maker the accused systems are required to "give priority to customer order execution over personal trading." (R. 162, CME's Mem. at 9.) According to CME, the undisputed facts confirm that this limitation is not met for two independent reasons: (1) "there is no evidence of any market makers systems being programmed to give priority to customer orders"; and (2) "the cited rules of CME and

CBOT do not relate to order execution." (*Id.*) The Court will examine each contention separately.

### A. Programmed

CME contends that TRG has cited no evidence of any market maker computers being programmed to give priority to customer orders over the personal trading of any market maker. (*Id.*) To CME, this failure is unsurprising "since it is undisputed that market makers are not required to hold customer orders, and there is no evidence that any market makers on Globex or e-cbot hold customer orders, act as brokers, or carry out customer instructions." (*Id.* at 10.) Like a similar argument made with respect to the "continuously maintain" limitation, this contention is insufficiently grounded in either the '923 patent language or the Court's construction. Stated differently, CME fails to specify why either the '923 patent's language or the Court's construction requires that this limitation be programmed into computers of the accused systems. This failure renders this argument unpersuasive, and thus an unacceptable basis to grant summary judgment in CME's favor.

### B. CME rules

Alternatively, CME argues that "summary judgment of noninfringement is appropriate because there is no genuine dispute that the rules of CME and CBOT upon which TRG and its expert rely relate to the priority of submission of orders rather than the priority of execution of orders." (*Id.*) According to CME, since the cited rules do not relate to order execution, "they therefore do not require the market makers on Globex and e-cbot to 'give priority to customer order execution over personal trading,' as required by the Court's construction." (*Id.*) To evaluate CME's position, the Court must first look to the language of some of the rules TRG

relies upon.

> CME Rule 530, in relevant part, provides:
>
> A member shall not buy (sell) a futures contract, buy (sell) a call option or sell (buy) a put option for his own account, an account in which he has a direct or indirect financial interest, or an account over which he has discretionary trading authority when he is in possession of an executable order for another person . . . regardless of the venue of execution.
>
> . . . .
>
> No person shall enter an order into the Globex platform for his own account, an account in which he has a direct or indirect financial interest or an account over which he has discretionary trading authority . . . when such a person is in possession of any order for another person that the Globex platform is capable of accepting.

(R. 196, TRG's Resp. to CME's N.D. Ill. L.R. 56.1 Statement, Ex. 12.)

Similarly, a CBOT rule prohibits a broker from making a purchase "while holding an order of another person." (*Id.*, Ex. 58.) In addition to these rules, the record also contains evidence suggesting that a market maker possessing a customer's order would have to give priority to the customer order. (*Id.*, Ex. 60 at 115-16.) Taken together, these portions of the record provide a basis upon which a reasonable jury could conclude that the "give priority to customer order execution over personal trading" limitation has been met by the accused systems. Summary judgment of noninfringement on this ground is therefore improper.

In its supporting memorandum, CME presents two arguments opposing this conclusion. First, it contends that because these rules relate to order submission, and not order execution, they cannot meet this limitation because they do not prioritize order execution. (R. 162, CME's Mem. at 11.) Second, CME suggests that this limitation cannot be satisfied by these rules because market makers "do not control the matching process, and therefore they cannot give

14

priority to customer order execution." (*Id.* at 12.) Both of these arguments, the Court concludes, read this limitation too narrowly. By its terms, this limitation requires that the accused systems "give priority to customer order execution over personal trading." Logically, it is evident that prioritizing customer order execution can be achieved via rules that prioritize customer order submission. In doing so, these rules governing the activities of the accused systems can give priority to the execution of customer orders without requiring that the accused systems themselves actually execute the customer orders. Given these conclusions regarding the relationship between the CME and CBOT rules and the claim limitation, CME's arguments in favor of summary judgment are unavailing.

### III. Bi-directional link limitation

Claim 9 of the '923 patent requires "a bi-directional communications link coupled between the futures and options computers . . . to facilitate intermarket trading to manage risk taken in a position resulting from a trade in either market." '923 patent, col. 11, ll. 22-26. Relatedly, claim 11 of the '923 patent requires a "bi-directional communications link coupled between the options computer and the principal market maker computer." '923 patent, col. 11, ll. 38-41. In its *Markman* order, the Court construed the term "link" as "a unit in a communication system" and "coupled" to mean "to join for combined effect." *Chi. Mercantile Exch.*, 721 F. Supp. 2d at 795-803. According to CME, "there is no genuine dispute that the accused systems do not have a 'bi-directional communications link' that allows two-way communication between the futures and options computers." (R. 162, CME's Mem. at 13.) As a result, they ask the Court to grant summary judgment of noninfringement as to claims 9 and 11 of the '923 patent. (*Id.*)

CME presents two arguments in support of its position. First, CME contends that summary judgment is proper because "TRG's Final Infringement Contentions and the Gambaro Report do not include any allegation or evidence that the accused systems allow two-way communication between the futures and options computers, even though TRG's own expert admits that two-way communication is required to meet this limitation." (*Id.*) In a second related argument, CME contends that "the links relied upon by TRG to allege infringement by CME's systems are used to facilitate messaging not between the futures and options computers, but between the market makers' computers and the separate futures and options matching engines." (*Id.*) Neither contention, the Court concludes, provides a basis to grant summary judgment of noninfringement.

As construed by the Court, claim 9 of the '923 patent requires a bi-directional communications unit in a communication system that is joined for combined effect between the futures and options computers to facilitate intermarket trading to manage risk taken in a position resulting from a trade in either market. Claim 11 of the '923 patent requires a bi-directional communications unit in a communication system that is joined for combined effect between the options computer and the principal market maker computer. Contrary to CME's position, these claim limitations do not require a bi-directional communications link which allows communications to be exchanged between either a futures and options computer or, in the case of claim 11, an options computer and the principal market maker computer. Rather, what is required is that this link be "joined for combined effect" between computers. To be "joined for combined effect," the Court concludes, does not require that this link allow two-way communication between computers. As such, CME's arguments in favor of summary judgment

for failure to satisfy this limitation are unconvincing, and are therefore an improper basis to grant judgment in its favor at this stage.

## CONCLUSION

For the reasons stated above, CME's motion for summary judgment of noninfringement of all asserted claims of the '923 patent (R. 161) is DENIED.

Entered: _____

Judge Ruben Castillo
United States District Court

**Dated:** June 6, 2011